**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**ALEXIS A. LIEN, OSB #110569**
alexis.lien@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2902
Telephone:    503-727-1000
Facsimile:    503-727-1117

*Attorneys for Plaintiff United States of America*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:20-cv-02184 |
| Plaintiff, | |
| v. | COMPLAINT *IN REM* FOR FORFEITURE |
| $81,185.00 IN UNITED STATES CURRENCY, *in rem*, | |
| Defendant. | |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Alexis A. Lien, Assistant United States Attorney, for its Complaint *in rem*

for forfeiture, alleges:

I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to 21

**Complaint *in rem* for Forfeiture**                                                        **Page 1**

U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

## II.

Defendant, *in rem*, $81,185.00 in United States currency, was seized in the District of Oregon, and is now and during the pendency of this action will be within the jurisdiction of this Court.

## III.

Defendant, *in rem*, $81,185.00 in United States currency, represents proceeds traceable to an exchange for controlled substances or was used or intended to be used to facilitate such a transaction in violation of 21 U.S.C. § 801, *et. seq.*, and is forfeitable to the United States pursuant to the provisions of 21 U.S.C. § 881(a)(6), as more particularly set forth in the declaration of Guy Gino, Special Agent, Department of Homeland Security, marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, Plaintiff, United States of America, prays that due process issue to enforce the forfeiture of Defendant, *in rem*, $81,185.00 in United States currency; that due notice be given to all interested persons to appear and show cause why forfeiture of the Defendant, *in rem*, should not be decreed; that due proceedings be had thereon; that the Defendant be forfeited to the United States; that the Plaintiff United States of America be awarded its costs and disbursements incurred in this action.

Dated this 15th day of December, 2020.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

/s/ Alexis A. Lien
ALEXIS A. LIEN, OSB #110569
Assistant United States Attorney

**VERIFICATION**

I, GUY GINO declare, under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Special Agent with the Department of Homeland Security and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.

/s/ Guy Gino_____
**GUY GINO**
Special Agent
Department of Homeland Security

## DECLARATION OF GUY GINO

I, Guy Gino, do hereby declare:

## PURPOSE OF DECLARATION

1.       This declaration is submitted in support of a complaint for forfeiture.   The information contained in this declaration is based on an investigation I conducted, which will show that $81,185.00 in U.S. currency seized from Alton Juan SWEENEY at the Portland Amtrak Station is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as moneys furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq.*  The facts set forth in this declaration are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of witnesses; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience.   This declaration does not set forth each and every fact that I or others have learned during the course of this investigation, only those necessary to establish probable cause to believe the seized currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## AGENT BACKGROUND AND TRAINING

2.       I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been so employed since 2003.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) and I am authorized by law to conduct investigations and to make arrests for felony offenses. I am currently assigned to the Assistant

Special Agent in Charge of HSI, Portland, Oregon.   Prior to this, I was employed as a U.S. Border Patrol Agent and have been a federal law enforcement officer since September 1996.   I am authorized and assigned to investigate violations of federal laws, including 21 U.S.C. §§ 841(a)(1), 846, 848, and 843(b) of the Drug Abuse Prevention and Control Act of 1970; that is, possession with intent to distribute and the distribution of controlled substances, conspiracy to commit such offenses, the operation of a continuing criminal enterprise, and the use of a communication facility to facilitate a felony violation of the Drug Abuse Prevention and Control Act of 1970.   During my tenure as a federal law enforcement officer, I have investigated and/or participated in investigations of conspiracy, money laundering, narcotics trafficking, fraud, smuggling and theft. I have also acquired knowledge and information about the illegal drug trade and the various means and methods by which it is furthered, including through the use of computers, smart phones, digital media and the Internet, from formal and informal training, other law enforcement officers and investigators, informants, individuals I have arrested and/or interviewed, and from my participation in other investigations.

3.      Since March of 2008, I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) Interdiction Taskforce (HIT).   The primary responsibility for HIT is the interdiction of narcotics and drug proceeds transported by couriers through the Portland International Airport, Amtrak train station, various interstate bus lines, and the highways and byways through the Portland Metropolitan area. HIT is also responsible for the interdiction of narcotics and drug proceeds carried through common couriers, such as FedEx, UPS, USPS, DHL and other parcel and delivery companies.

## BACKGROUND ON NARCOTICS PROCEEDS

**Declaration of Guy Gino**                                          **EXHIBIT A    Page 2**

**TRANSPORTED THROUGH TRAIN STATIONS**

4.     I know from my training and experience that drug traffickers transporting narcotics proceeds will frequently use Amtrak to transport proceeds to a source city in order to purchase controlled substances, including marijuana, cocaine, heroin, and methamphetamine. I know from my training and experience that subjects trafficking narcotics proceeds often use Amtrak to transport proceeds because of their ability to maintain custody of the proceeds and the absence of the Transportation Security Administration (TSA) security screening checkpoints at most Amtrak stations, which aids in the low detection rate by law enforcement. I know from my personal experience, training, and discussions with other law enforcement officers that these controlled substances and proceeds of the illegal sale of controlled substances are often found during train interdictions at the Amtrak Station in Portland, Oregon.

5.     Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know Oregon is a marijuana source state for destination locations across the United States. Current Oregon state laws permitting the recreational, commercial, and medical growth, purchase, and possession of marijuana provide individuals with significant quantities of marijuana, which can be illegally exported to other states where marijuana is illegal or less available in order to derive substantially increased profits.

6.     Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know that certain indicators exist when drug traffickers book Amtrak travel for the purpose of purchasing narcotics. These travel indicators are inconsistent with normal travel and would only be justified under extraordinary circumstances.

7.     I know from my training and experience that drug traffickers will book their Amtrak

**Declaration of Guy Gino**                                    **EXHIBIT A    Page 3**

travel the same day or several days before their travel. This is often done because the availability of narcotics and narcotics proceeds changes on short notice. Drug traffickers have narrow windows to conduct drug transactions when a source of supply obtains narcotics. Otherwise the source will find another buyer.

8.      I know from my training and experience that drug traffickers will book one-way travel or have short turn around trips. This is commonly done because drug traffickers are delivering narcotics proceeds to their source of supply (and do not require a lot of time at their destination) or the drug trafficker is planning on transporting the purchased narcotics by car/train back to their originating city.

9.      I know from my training and experience that drug traffickers will often book their travel using false names as well as a third party to purchase the tickets. This is done as a means to thwart law enforcement's ability to identify individuals who are travelling for this purpose in advance as it prevents the cross referencing of passenger manifests against law enforcement databases to identify travelers who have previously been arrested for narcotics trafficking in the past.

10.      I know from my training and experience that, when contacted by law enforcement, drug traffickers carrying narcotics proceeds will be deceptive about the amount of currency they are carrying. Drug traffickers usually underestimate or are evasive about the quantity of the currency they are carrying because they are aware law enforcement can seize narcotics proceeds. Drug traffickers usually believe that if they are in possession of a lesser amount of currency that it is less likely to be seized by law enforcement. It is common for drug traffickers carrying narcotics proceeds to change their statements regarding the amount of currency that they

are carrying several times.

## SUMMARY OF INVESTIGATION

11.     On April 23, 2020, Portland Police Bureau Officers and HSI Task Force Officers (TFOs) assigned to HIT were working an interdiction detail at the Amtrak train station located on 6th Avenue in Portland, Oregon.

12.     Specifically, law enforcement officers were working Amtrak Train 27, which originates from Chicago, Illinois and terminates in Portland, Oregon. I know that this route is known by law enforcement as one that is commonly used by individuals who transport drugs to transport their drug proceeds. I personally have been involved in over 100 investigations involving the transportation of narcotics and/or narcotic proceeds using this route.

13.     There were less than ten passengers scheduled to disembark from the train in Portland, Oregon so members of HIT prepared to contact all of the passengers who disembarked from the train.

14.     Members of HIT (who were in plain clothes with no outward police markings displayed) observed the passengers exit the train. As they walked towards the investigators, members of HIT contacted all passengers who exited the train.

15.     At approximately 10:15 a.m., I and members of HIT observed a passenger exit the train pulling a large purple roller suitcase and carrying a black back pack. The passenger began walking towards the HIT investigators.

16.     Portland Police Bureau Officer Verbout, without blocking the passenger's path, showed his Portland Police badge and identified himself as a Portland Police Officer, and asked the passenger permission to conduct a drug detection dog sniff of his bags. The passenger stated

"Yes," and stopped and let go of his roller suitcase.  Officer Verbout asked the passenger if he would mind setting his backpack on the ground so the dog could sniff it.  The passenger removed his backpack and set it on the ground and said, "Yeah."

17.    Portland Police Bureau K-9 Officer Groshong deployed his drug detection dog "Rex" on the purple roller suitcase. He observed the purple roller suitcase had a name tag with "Kevin Adams" scribed on it. During the drug detection sniff of the purple roller suitcase, Officer Verbout observed the passenger pick up his backpack and begin to put it back on before the drug detection dog could sniff the backpack. Officer Verbout explained to the passenger that the dog had not yet sniffed the back pack and asked him if he would mind setting it back down. The individual set the backpack back on the ground and Officer Groshong deployed Rex on the backpack.

18.    Officer Groshong observed Rex alert to the presence of narcotic odor emanating from the black back pack and told Officer Verbout that there was a positive alert.  Rex did not alert to the presence of narcotic odor emanating from the purple roller suitcase.

19.    Officer Verbout asked the passenger if there was a reason the drug detection dog would alert to the presence of narcotic odor coming from his backpack.  The passenger informed the investigators that he smokes marijuana and maybe it was on his clothes.  Officer Verbout then asked permission to search the passenger's back pack. The passenger replied "yes," and handed Officer Verbout the backpack.

20.    Officer Verbout opened the backpack and found two brick-shaped bundles.  Each bundle was wrapped in aluminum foil and vacuum sealed. Officer Verbout asked the passenger what was inside the bundles, to which the passenger responded "money."  The backpack also

**Declaration of Guy Gino**                                    **EXHIBIT A    Page 6**

contained a black towel, a pair of jeans, an Amtrak ticket issued to Kevin Adams, and a pair of underwear which is depicted in photo 1 below.



*Photo 1.*

21.    The passenger was detained under suspicion of violating ORS 172.164 (Laundering a Monetary Instrument). The passenger was escorted to the HIT Amtrak office to talk. The passenger was cooperative and was not placed in handcuffs. When the passenger was brought into the HIT Amtrak office, he was searched.   A wallet which containing U.S. currency was found on the passenger. The wallet's contents were inventoried, and investigators located a Virginia-issued driver's license and identification card issued to Alton Juan Sweeney. The photograph on the identification card was of the passenger.

22.    At approximately   10:25 a.m., in the HIT Amtrak office, Officer Verbout read Sweeney his Miranda Warning and asked him if he understood his rights. Sweeney replied, "Yes."

**Declaration of Guy Gino**                                                        **EXHIBIT A    Page 7**

Sweeney told Officer Verbout that there was approximately $60,000 of U.S. currency in the two bundles inside the back pack. Sweeney stated that he packaged the currency in aluminum foil and vacuum-sealed plastic because he wanted it to fit in a back pack and be able to hide it if someone was to look inside the bag. Sweeney further elaborated that he does not trust banks and does not have any bank accounts.

23.     After the discovery of the currency, investigators asked for and received consent from Sweeney to search the purple roller suitcase, which was mostly empty aside from a few articles of clothing, a belt, petroleum jelly, and headphones.

24.     Sweeney's wallet contained several photo identifications, an insurance card, a prepaid debit card and a QPay phone service receipt in the name of ****** Jones for $80.00 on April 16, 2020.

25.     Officer Verbout asked Sweeney where he was employed. Sweeney stated that he owns two businesses: one named "AA Contracting and Development" and the other named "Alt's Quality Lawn Care." Both businesses are based in Virginia.

26.     Sweeney told Officer Verbout that he was travelling to Oregon to visit his aunt who is named Caroline Jones. Sweeney told investigators that his cousin needs a heart transplant and he was travelling to Oregon to give the $60,000 to his aunt to help out with the cost of the surgery.

27.     Initially, Sweeney told Officer Verbout that he did not know the name of his cousin but later stated her name was "Christina." Sweeney also informed Officer Verbout that he had not spoken to his aunt in four days and that his aunt was unaware that he was coming to Oregon. Sweeney explained that his visit and the money for the heart transplanted was intended to be a surprise.

28.    Officer Verbout asked Sweeney about his travel itinerary. Sweeney stated that this was his first trip to Oregon and that he got on the train in Washington D.C.  Sweeney stated he planned on staying in Oregon for a couple of weeks and had not purchased a return ticket yet.

29.    Officer Verbout asked Sweeney about the source of the U.S. currency inside the bundles found in his backpack. Sweeney stated all of the money belonged to him and he made it working at the two businesses that he owned, but added that "A couple thousand here and there [came] from different casinos." When asked when was the last time he worked, Sweeney stated he last worked doing a sand swirl finish on some walls and was paid $2,800 in cash.  Sweeney was not able to provide a specific date that this work occurred.

30.    Officer Verbout asked Sweeney if he could provide information regarding which casinos he won money at. Sweeney was unable to provide Officer Verbout with the names of those casinos or a specific dollar amount he won.

31.    Sweeney had also told Officer Verbout that he filed his taxes in 2019 for 2018 and he claimed to have "hundreds of thousands of dollars" for the businesses. But when pressed, Sweeney was unable to tell Officer Verbout what his income for 2018 was. Sweeney explained that he has someone else handle his money for his businesses as well as his taxes. Sweeney further explained to Officer Verbout that the businesses were not in his name but are in his wife's name, who he identified as Krystal.

32.    Sweeney said he and his wife rent a house and own a car. Sweeney said he does not know how much he pays in rent, car payments, or insurance because his wife handles all of the bills.   Sweeney also informed investigators that his wife works for "Let's Go Travel 757."

33.    During the interview, Portland Police Bureau Officer Derry conducted a query

using the Google search engine and located a phone number for Alt's Quality Lawn Care. Officer Derry called the number listed and, after identifying himself, asked to speak to the owner. Officer Derry spoke with an individual who identified himself as Alton Robinson. When Officer Derry asked Mr. Robinson if he employed an Alton Sweeney, Mr. Robinson identified himself as Sweeney's father.

34.     Mr. Robinson informed Officer Derry that he is the owner of Alt's Quality Lawn Care, not Sweeney.  Mr. Robinson stated that Sweeney will on occasion work for him at Alt's Quality Lawn Care. Mr. Robinson also stated that the business has been slow because of the quarantine and Sweeney has not been working very much.

35.     Officer Derry asked Mr. Robinson if he knew of any family members that currently live in Oregon. Mr. Robinson stated he did not know of any but would check if Sweeney's mother knew of any and would contact Officer Derry back if he found out about family living in Oregon.

36.     Officer Verbout paused the interview to briefly speak to Officer Derry about what he had learned during his conversation with Mr. Robinson, and then resumed the interview with Sweeney.

37.     Officer Verbout told Sweeney that if the money was indeed for his cousin's heart transplant, he did not want to delay her getting the money. Officer Verbout further explained to Sweeney that Officer Derry had just spoken to his father and what Sweeney 's father relayed to Officer Derry. Sweeney insisted that the money was for his cousin's heart transplant. Officer Verbout asked Sweeney if he would call his aunt to verify his story. Sweeney declined.

38.     Officer Verbout readdressed ownership of Sweeney's businesses. Sweeney acknowledged that his father was the true owner of "Alt's Quality Lawn Care" and that "AA

**Declaration of Guy Gino**                                              **EXHIBIT A    Page 10**

Contracting and Development" has been out of business for a couple of months.

39.     Officer Verbout asked Sweeney permission to look through his phone.   Sweeney said, "Go look through it."   During Officer Verbout's review of the phone, he noted that there was not much data on the phone and that it appeared to be new or recently deleted. He did not see anything concerning the money found in Sweeney's back pack. Furthermore, he did not see any messaging or previous call logs with Sweeney's aunt concerning his sick cousin.

40.     Amtrak Detective Vanderfange was able to identify that Sweeney had purchased a ticket and traveled under the name "Kevin Adams." This was the same name on the tag affixed to the purple roller suitcase. Detective Vanderfange told Officer Verbout this information and that the Amtrak system showed that Sweeney's ticket was purchased in person with a credit card on April 19, 2020 in Norfolk, Virginia. This was less than 24 hours when Sweeney began his journey in Norfolk, Virginia on April 20, 2020. The ticket was upgraded by paying $626.00 to travel in a sleeper car in Washington D.C. with a stop in Chicago before traveling to Portland.   Detective Vanderfange further stated that this train trip takes four days.

41.     Officer Verbout found it suspicious that Sweeney would travel under a false name. He also found it suspicious that Sweeney would take an expensive four-day train ride instead of a flight, which would have been cheaper and quicker. Officer Verbout believed that if the money was for a medical emergency like a heart transplant, the quickest mode of travel would be preferable. Officer Verbout asked Sweeney about this, and why he was travelling under a false name. Sweeney denied that he was traveling under a false name and asked for the Amtrak Detective to come in to the room so he could ask him about it.   Detective Vanderfange came into the room and explained what he knew about the ticket purchase and itinerary, then asked Sweeney

why he was traveling under the name "Kevin Adams."  Sweeney replied, "I want to speak to an attorney."  Sweeney was not asked any further questions.

42.    A criminal history query was conducted on Sweeney as part of the investigation. The criminal history shows that Sweeney has six felony convictions and, as of the date of the seizure, was on supervised release in Virginia.  The convictions were for robbery with a firearm, grand larceny, and probation violations.

43.    At approximately 11:45 a.m., Sweeney was released from the Amtrak office.

44.    During the interview, Officer Verbout asked Sweeney multiple times about how much U.S. currency was in the back pack and every time Sweeney stated there was $60,000 in the back pack. The U.S. currency from the back pack totaled $79,985.  Sweeney also had $1,200 in his wallet.

45.    After this investigation commenced, I was made aware that on June 13, 2020, at approximately 5:37 a.m., Mojave County Sheriff's Office (MCSO) Detective Wilbert Jones conducted a traffic stop on Alton Sweeney in Arizona which resulted in the seizure of $135,110 in U.S. currency.

46.    I reviewed Detective Jones' report, which informed me that on that date and time Detective Jones was conducting highway interdiction duties when he observed a white sedan traveling too close to a semi-tractor trailer westbound on Interstate 40. Detective Jones observed the distance the white sedan was traveling behind the semi-trailer and determined it was unsafe. At approximately mile post 44, he caught up to the white sedan and activated his emergency red and blue lights to perform a traffic stop.

47.    Detective Jones approached the passenger side of the vehicle and made contact with

**Declaration of Guy Gino**                                              **EXHIBIT A    Page 12**

a passenger and the driver of the vehicle. He introduced himself and informed the driver of the reason for the traffic stop. The driver identified himself as Alton Sweeney, who provided a driver's license issued from Virginia. The passenger was identified as Kenyatta Ferrell Jones (hereafter "Mr. Jones"), also from Virginia.

48.    Mr. Jones was discovered to have a felony conviction for larceny in Norfolk, Virginia.

49.    Detective Jones spoke with Mr. Jones, who informed him that the vehicle was a rental and that he had the rental agreement on his phone since he rented the vehicle. Detective Jones asked Sweeney to step out of the vehicle so he could perform records checks as well as issue him a written warning. Sweeney agreed to do so. Detective Jones told Mr. Jones that he would return to look at the rental agreement after Mr. Jones was able to retrieve it from his cellphone.

50.    Sweeney took a seat in Detective Jones' front passenger seat as Detective Jones sat in the driver's seat. Detective Jones asked Sweeney where he was coming from. Sweeney stated he lives in Texas right now. During this time, Detective Jones was performing records checks as well as completing a written warning. Sweeney also informed Detective Jones that Mr. Jones had rented the vehicle and that Mr. Jones was Sweeney's brother. Detective Jones asked Sweeney where they were heading. Sweeney stated that they were going to Las Vegas, probably for the weekend. Sweeney said that he had never been to Las Vegas before.

51.    Detective Jones asked Sweeney if there was anything illegal in the car, such as marijuana, Marijuana pens, or any other minor drug paraphernalia. Sweeney responded by stating "nah." Sweeney also stated that there were no guns inside of the vehicle.

**Declaration of Guy Gino**                                            **EXHIBIT A    Page 13**

52.     Detective Jones explained to Sweeney that he was assigned to catch people who were trafficking drugs, guns, people or anything illegal on the interstate so not to be offended when he asked questions. Detective Jones proceeded to ask Sweeney if there was any large amounts or bulk currency inside of the vehicle. Sweeney responded by stating "no sir." Detective Jones then asked if Sweeney had any cash in the car at all. Sweeney claimed he only had what was in his wallet but they did not have any bulk cash in the car.

53.     Detective Jones asked Sweeney to step out of the vehicle and stand near the front door so he could go view the rental agreement from Mr. Jones. Detective Jones approached the passenger side of the white sedan and contacted Mr. Jones. As he did this, Mr. Jones began to pull the rental agreement up on his cell phone. Detective Jones asked him where they were going. Mr. Jones informed him that they were going to California to visit his aunt. Mr. Jones stated they were going to stay in California for three weeks. Detective Jones asked him what was his relation to Sweeney.  Mr. Jones claimed Sweeney was his cousin. Detective Jones viewed the rental agreement then returned to the passenger side of his MCSO vehicle where Sweeney was standing.

54.     As Detective Jones was finishing his warning, he asked Sweeney how much U.S. currency was in the vehicle. Sweeney informed him that they had $20,000 in the trunk. Detective Jones asked him how the currency was packaged, to which Sweeney responded that it was it was vacuum sealed.

55.     Detective Jones asked for Sweeney to give him consent to search the trunk of the vehicle, to which Sweeney gave his permission. Sweeney also told Detective Jones that Mr. Jones knew how much money was in the trunk. Detective Jones asked Mr. Jones how much money was in trunk and Mr. Jones told Detective Jones that he did not know about any money in the trunk.

**Declaration of Guy Gino**                                    **EXHIBIT A    Page 14**

56.    Detective Jones requested another deputy to arrive so he could safely search the trunk. While waiting for another deputy to arrive, Sweeney changed his story and informed Detective Jones that the trunk actually contained $70,000. Sweeney again told Detective Jones that he could search the vehicle and check the money out. Detective Jones told Sweeney that if that is what he wanted him to do he would do it.

57.    After another deputy arrived, Detective Jones approached the passenger side of the vehicle and asked Mr. Jones to step out of the vehicle. Detective Jones opened the trunk of the vehicle and observed 2 black duffle bags and some shoe boxes. He lifted one duffle bag and asked Sweeney if that is where the U.S. currency was located. Sweeney replied yes. Detective Jones opened the duffle bag and observed 3 airtight vacuum-sealed packages with U.S. currency inside of them. Detective Jones knew from his training and experience that the amount of U.S. currency visible to him was more than $70,000.

58.    Through my training and experience, I know drug traffickers or money launderers commonly package currency in air tight vacuum-sealed packages to avoid any odor being detected by law enforcement. Sweeney's U.S. currency that was seized on April 23, 2020 in Portland, Oregon was also in vacuum-sealed packages.

59.    Detective Jones placed Sweeney in handcuffs and explained he was not under arrest but was being detained. Detective Jones had another deputy detain Mr. Jones by placing him in handcuffs as well.

60.    Detective Jones returned to the vehicle to continue searching it. Detective Jones observed that the second black duffle bag was empty with the exception of dryer sheets.

61.     I know through my training and experience that dryer sheets are commonly used to attempt to cover up or mask the odor of narcotics. To find these in a big empty duffel bag without noticing the scent of freshly cut marijuana means to me that the bag was intended to be used to transport marijuana in the future.

62.     The remainder of the vehicle was searched and no further contraband was found. Detective Jones contacted Sweeney and Mr. Jones one after another and advised them both of their Miranda rights.    Both Sweeney and Mr. Jones informed Detective Jones that they understood their Miranda rights. They were both then transported to Detective Jones' office to be interviewed. Sweeney and Mr. Jones both informed Detective Jones that they would like to talk to their attorneys before they provided a statement. No interviews took place.

63.     Detective Jones seized multiple cellular phones and U.S. currency as evidence. The U.S. currency was counted and totaled $133,110.00. Sweeney and Mr. Jones were released with their other belongings and their rental car.

64.     On June 16, 2020, Deputy Gunnoe deployed his drug detection dog "Bruno" on the U.S. currency. Detective Jones had hidden the seized U.S. currency in one of four cement boxes with steel lids. These boxes were placed in a row lengthwise from east to west and spaced about two feet apart.

65.     Deputy Gunnoe informed Detective Jones that his drug detection dog "Bruno" alerted to narcotic odor emanating from one cement box. Detective Jones confirmed that the box Bruno alerted to the box that contained the seized U.S. currency.

66.     On June 26, 2020, Detective Jones drafted a state search warrant for all 5 cell phones that were found in the vehicle or on Sweeney and Mr. Jones. The search warrant was

**Declaration of Guy Gino**                                         **EXHIBIT A    Page 16**

applied for and authorized by Mojave County Circuit Court Judge M. Binkley. The search warrant could not be executed because the phones were locked, so Detective Jones sent the phones to HSI Phoenix for advanced extraction.

67.    On November 2, 2020, Detective Jones received a seized cell phone back from HSI Phoenix. An Apple iPhone was able to be forensically imaged and identified as belonging to Kenyatta Ferrell Jones.

68.    On November 4, 2020, Detective Jones reviewed the forensic image of Mr. Jones' iPhone. In reviewing the forensic image, Detective Jones observed a text conversation between Mr. Jones' phone (757-966-8625) and a phone with the number 206-508-4609, which occurred between the dates of May 2, 2020 and May 28, 2020.

69.    Throughout the text conversation, Detective Jones observed three photographs which contained pictures of large quantities of marijuana. During the text conversation, the person with whom Mr. Jones was texting stated that he might have "action at something better."  Mr. Jones responded by saying "Tuesday." Detective Jones also observed messages between Mr. Jones and this individual discussing what appeared to be drug weights.  For example, he observed a message that was sent to Mr. Jones that said "I got a sample for some shit at 16 looks good but kinda similar." Other text messages involving weights were also observed; for example, a text message stating "I gotta 14 but that other stuff he said tomorrow." Detective Jones also observed one of the photographs containing marijuana had an incoming message sent with it which said "13.50 in front of me."

70.    Based on my training and experience, these conversations show that Mr. Jones was in contact with a marijuana broker who was identifying quantities of marijuana that they either had

in their possession or could have in their possession if Mr. Jones was interested in buying marijuana from them.

71.    Mr. Jones' phone also contained a text conversation between his number and 503-878-3560 which took place on June 6, 2020. The text had an incoming photograph showing a large quantity of marijuana. A text message was sent with the photograph which read "Miracle Alien Cookies."   Mr. Jones responded by asking "how much are they." The individual sent a text message back stating "1350."

72.    Based on my training and experience, I believe that this conversation shows Mr. Jones being solicited from an individual using a (503) area code assigned phone number who was selling marijuana strain dubbed "Miracle Alien Cookies" and that the marijuana was priced at $1350 per pound. I know that 503 is the area code assigned to Oregon.

73.    Mr. Jones' cell phone also showed a conversation on May 23, 2020 between Mr. Jones and 757-965-9503 where an unknown individual sent a message stating "My people said that joint was 2 zips short." Mr. Jones replies "I got him." The unknown individual writes "Nigga want his bud cuh wree ylu [sic] want me to come to" and Mr. Jones replies "Box-city."

74.    In reviewing this message, it is very clear to me based off of my training and experience that the unknown individual is informing Mr. Jones that one of his customers was 2 ounces short of marijuana. I know a "zip" to represent an ounce of flowery bud marijuana. Mr. Jones tells the unknown individual that he will make good and provide the two ounces of marijuana. The unknown individual informs Mr. Jones that the customer urgently wants the two ounces and asks where they should meet. Mr. Jones tells the unknown individual to meet him at Box-City.

**Declaration of Guy Gino**                                    **EXHIBIT A    Page 18**

75.    Mr. Jones' cell phone also contained a text message conversation between Mr. Jones and 901-283-0134 which occurred between the dates of April 27, 2020 and May 4, 2020. This conversation contained several photographs as well as videos showing pound quantities of marijuana. Throughout the conversation, Mr. Jones discussed prices as well as where to go to buy the marijuana. The unknown individual told Mr. Jones he would have to come to Portland, Oregon.

76.    Mr. Jones' cell phone also contained messages between Mr. Jones and 253-281-3648 which occurred between the dates of May 2, 2020 and May 3, 2020. During this conversation, Mr. Jones sent a text message saying "My fault I'm up north looking at bags right now." Mr. Jones used the street term "bags" which is recognized to mean pounds of marijuana. Mr. Jones' message coincided with other messages where he was to be in Oregon to purchase quantities of marijuana. I believe that when Kenyatta states "My fault I'm up north looking at bags right now" it means that he was in Oregon looking at marijuana to purchase.

77.    Mr. Jones' cell phone also showed a conversation thread of Mr. Jones receiving text notifications of funds being deposited into his CASH app account. I know through my training and experience that CASH app is a peer-to-peer payment application for both iOS and Android mobile devices. The CASH app is used to send and receive money. The recipient receives a text message from the CASH app server when funds are received.

78.    These CASH app notifications showed Mr. Jones receiving funds from several different people in different amounts up to $865.00. I know through my training and experience that these amounts are consistent with ounce, quarter pound, and half pound quantities of marijuana being sold in states where recreational marijuana is not legal or less available than it is in Oregon.

**Declaration of Guy Gino**                                              **EXHIBIT A    Page 19**

79.    In reviewing the information stemming from the seizure of $135,110 from Sweeney and Mr. Jones and the seizure of $81,185 from Sweeney, it is my belief that they are co-conspirators in marijuana trafficking whereby they come to Oregon to purchase marijuana and then take the marijuana out of state to re-sell it in states where marijuana is illegal or less available, I further believe that the $81,185 seized from Sweeney on April 23, 2020 represents proceeds from the trafficking of marijuana and that it was intended to be used to purchase marijuana in Oregon that would be resold in states where marijuana is illegal or less available.

80.    I believe that the $81,185 in U.S. currency Sweeney had in his possession on April 23, 2020 was intended for the purchase of marijuana and that Sweeney was going to use his purple roller suitcase to transport the purchased marijuana back to Virginia. The fact that the drug detection canine alerted to narcotic odor from the U.S currency also supports my belief that the seized assets were proceeds of past drug trafficking.

81.    I believe that when Sweeney and Mr. Jones were stopped in Arizona by Detective Jones on June 13, 2020, they were on their way to Oregon to purchase marijuana with the $133,110 in U.S. currency that was seized and that they were going to use the large black duffel bags to transport the marijuana out of Oregon for resale in other states where marijuana is illegal or less available.

## CONCLUSION

82.    Based on the foregoing information, I have probable cause to believe, and do believe, that the $81,185 in U.S. currency seized from Alton Juan Sweeney is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as moneys furnished or intended to be furnished by any person

in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq.*

  I declare under penalty of perjury that the forgoing is true and correct pursuant to 28 U.S.C. § 1746.

        Executed this 15th day of December 2020.

        */s/ Guy Gino*
        Guy Gino
        Homeland Security Investigations

**Declaration of Guy Gino**          **EXHIBIT A**  **Page 21**

℘JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
     Plaintiff

☐ 3   Federal Question
     (U.S. Government Not a Party)

☐ 2   U.S. Government
     Defendant

☐ 4   Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1  Original
    Proceeding

☐ 2  Removed from
    State Court

☐ 3  Remanded from
    Appellate Court

☐ 4  Reinstated or
    Reopened

☐ 5  Transferred from
    another district
    (specify)

☐ 6  Multidistrict
    Litigation

☐ 7  Appeal to District
    Judge from
    Magistrate
    Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____